**SUBURBAN PROPANE GAS CORPORA-TION, a corporation of the State of New Jersey, Defendant Below, Appellant,**

v.

**George F. PAPEN, Howard W. Papen, and John H. Papen, trading as Papen Bros., a partnership, Plaintiffs Below, Appellees.**

Supreme Court of Delaware.

Aug. 27, 1968.

Reargument Denied Sept. 20, 1968.

See also, Del., 229 A.2d 567.

**796**

James T. McKinstry, of Richards, Layton & Finger, Wilmington, for defendant, below, appellant.

Harold S. Schmittinger, of Schmittinger & Rodriguez, Dover, for plaintiffs below, appellees.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

CAREY, Justice:

The defendant below, appellant, Suburban Propane Gas Corporation (Surburban), has appealed from a judgment of the Superior Court in favor of the partnership of George F. Papen, Howard W. Papen, and John H. Papen, t/a Papen Bros. (Papen), appellee. Jury trial was waived. The appellee was awarded damages resulting from the partial destruction of a building by an explosion of gas and a resulting fire. The loss was allegedly caused by the negligence of Surburban's employee Courtney.

The sole issue is whether the evidence is adequate to support a finding of negligence proximately causing Papen's loss.

Papen operates some vegetable farms near Wyoming, Delaware. On one of them, it had a labor camp for housing transient workers who were brought from Florida each year to pick beans. Those laborers were brought to Delaware by a crew leader, who after their arrival had complete supervision of the camp. While there, they lived in a building owned by appellee, which was a single-story frame structure divided into twenty-three rooms. Lengthwise it was separated into two parts by a partition running through the middle from north to south. At some places, two rooms were connected so as to form apartments with a single door leading outside; this was true of rooms 2 and 4, which were at the south end and on the west side of the building.

Each living unit was provided with a cooking facility burning propane gas. Two of them were furnished with ranges, and the rest with two-burner units or hot plates. Gas for all of these hot plates was stored in two 420-lb. cylinders located immediately outside the west wall of the building. From the cylinders, gas was conducted through ½-inch copper pipes to those rooms which contained hot plates. Single pipes extended in each direction from

the cylinders along the outside wall. Individual connections to the various rooms were made by tees, and on each connecting line there was a separate meter and an outside valve. Each interior line contained a valve about eighteen or twenty inches away from the burner.

The system was originally installed by Surburban in 1960 or 1961. At the end of each season, Surburban turned off the gas and disconnected the units, which were then cleaned and stored by employees of Papen. Shortly prior to the next season, Surburban reconnected the units, turned on the gas, and tested the system and the units, repairing any faults which were found. Surburban supplied the gas as needed in the various cylinders.

On June 12, 1963, Courtney went to the premises to restore service. After reconnecting the units and turning on the gas, he checked them with a manometer and found everything in proper order except one hot plate, which had a defective manifold. He disconnected that unit and may have left it in the room.* He turned off the inside valve, and screwed a brass plug into the end of the open line and capped it. He could not remember the room number where this unit was left disconnected, and failed to note the matter on his worksheets; he recalled, however, that it was a room somewhere towards the southerly end of the building.

By June 18, 1963, the rooms were occupied by the transient workers. On that date, Surburban's employees, at the request of the crew leader or one of the Papen brothers, connected two hot plates in the building. One was a new plate installed in a room where none had been before; the other apparently was one which was already in the building but was not connected. The record does not disclose the room numbers in which these connections were made, but the meter numbers for

them make it clear that neither change took place in room 2 or 4.

On July 2, 1963, between 1:00 and 2:00 p. m., Surburban's driver filled the gas tanks. He read the meters at that time and discovered that the figure on the meter for room 4 was exactly the same as it had been the preceding fall when the system was closed. This of course meant that no gas had passed through the meter from June 12 to July 2, although rooms 2 and 4 had been occupied since June 18 by three laborers. All other meters disclosed the use of gas during that period.

At about 11:00 p. m. on July 2, there was an explosion which blew out the south wall and part of the west wall of the building. A fire broke out almost immediately and a second explosion occurred about fifteen minutes after the first one. About half of the building—the southerly part—was badly damaged.

Two experts—one an officer of Surburban, the other a Deputy State Fire Marshal—came to the camp the following day. They found practically all of the copper pipe gone, but the meters were intact. All meters showed a normal consumption of gas, except the one for room 4, which indicated a flow of 72 units, or 36 lbs., of propane through the meter. This flow obviously occurred during the period between the delivery of gas early that afternoon and the time of the explosion. That quantity of gas, according to Suburban's expert, is sufficient to operate a gas range for a month with normal use; it would take about fifty to fifty-five hours of constant use for that quantity to flow through a hot plate, with both burners open. He concluded that the gas must have escaped directly out of the copper tube and that the minimum time required for that quantity to pass through the line would be about four hours. According to his unchallenged computations, the flow started no later than 7:15 or 7:30 p. m., and was due to the

---

* His testimony on this point is equivocal. For present purposes, we will assume that he did not remove it.

opening, by breaking or otherwise, of the line itself. He also concluded from all the known facts that (1) the gas accumulated in room 4; (2) the first explosion was that of the accumulated gas ignited in an unknown manner; (3) the fire resulted from the explosion; and (4) the second explosion was the bursting of a gas cylinder at the south end of the building, which supplied a gas range in room No. 1.

No expert witness was able to give any opinion as to the actual basic cause for the episode, each of them stating that any opinion would be pure guesswork and speculation.

▆▆▆▆ The law applicable to this case, in our opinion, is similar to that set forth in Hercules Powder Co. v. DiSabatino, 5 Storey 516, 188 A.2d 529. The defendant is liable for injuries from gas caused by its negligence, but is not an insurer. It is presumed to know the inherent danger presented by gas and is required to exercise a degree of care commensurate with the danger. It is bound to guard against any contingency, combination of circumstances, or accidents which a person of ordinary intelligence would have foreseen as probable to happen. The extent of its duty and the standard of care it must conform to are measured in terms of the foreseeability of injury from the situation created by it. Each case is to be decided in the light of its own facts, with due regard to the surrounding circumstances, and whether or not the subsequent act was normal and expectable. But negligence cannot be predicated upon a failure to anticipate extraordinary and unprecedented acts of others.

▆▆▆▆ The trial Judge did not base his decision on the doctrine of *res ipsa loquitur*, although that question was apparently raised in the Court below. It has not been relied upon in the arguments before this Court. It obviously has no application in the present case because the mere circumstances of the explosions and fire do not present an inference of negligence of such force as to call for an explanation or rebuttal by defendant. See Ciociola v. Delaware Coca Cola Bottling Company, 3 Storey 477, 172 A.2d 252.

The decision below, and Papen's argument here, are predicated upon the contention that Courtney was negligent in plugging the line and closing the inside valve instead of the outdoor valve, and leaving the defective burner in the room without informing Papen of the situation. The evidence concerning what he did was given by Courtney himself, but (assuming his acts add up to negligence) the proof of proximate cause is purely circumstantial, as we shall point out in more detail.

▆▆▆▆ The *Ciociola* case, supra, discusses the burden of proof which rests upon a plaintiff when circumstantial evidence is relied upon to prove negligence; those same requirements apply to proof of proximate cause. 38 Am.Jur. 1033. In order to prove proximate causation by circumstantial evidence, it is necessary that such conclusion be the only reasonable inference possible from the proven circumstances; if they are as consistent with lack of proximate cause as with its existence, neither conclusion can be said to have been established by legitimate proof. In the present case, we must review the inferences and deductions drawn by the trial Judge from the proven circumstances, in accordance with Nelson v. Murray, Del., 211 A.2d 842, and the cases cited therein.

▆▆▆▆ The view that Courtney's alleged negligence caused the explosion necessarily includes a finding that the defective burner and the plugged line were in room 4; obviously, if his allegedly negligent acts occurred in some other room, they did not cause the accumulation of gas in room 4. As mentioned earlier, Courtney was able to say only that the plugged line was some-

where. towards the southerly end of the building. No one else testified on that point. The only circumstance which suggests that it was in room 4 is the fact that the accumulation of gas concededly was in that room. But this conclusion is not the only reasonable inference that can be drawn from the evidence. Courtney testified that he connected all of the plates save the defective one on June 12. Aside from the installation on June 18 of a new plate where none had existed before, a plate was connected in some room other than 4 on that same date. It is not unreasonable to believe that this other room was the place where Courtney had originally left the place unconnected. Since the circumstantial evidence on this point is equally consistent with both conclusions, it follows that Papen did not meet the burden of proving proximate cause.

The foregoing conclusion may be a sufficient answer to Papen's contentions; but we believe that there are other reasons which dictate the same result. Those reasons pertain to the alleged negligence. In discussing this angle of the case, we will assume, contrary to what we have previously said, that the defective burner was in fact left in room 4.

 Papen argues that Courtney ought to have foreseen that a resident of the building would tamper or meddle with the copper pipe and attempt to connect the hot plate, and should have guarded against that hazard by turning off the outside valve, perhaps removing the plate from the room, or at least notifying appellee of the situation. Here again, the suggestion that someone did tamper with the line by trying to reconnect the hot plate is not supported by any direct testimony and is only one possible explanation of what occurred. Other inferences are just as reasonable, e. g., someone broke the line itself accidentally, or did so intentionally for the purpose of stealing the copper tubing. The latter possibility finds some support in the fact that nearly all of the copper pipe from the entire building mysteriously disappeared by the early part of the next afternoon, and in the further fact that copper at the time was selling for a high price. But in any event, was Courtney bound to anticipate that someone would unscrew the brass plug, turn on the inside valve, then, when the odor of gas began to permeate the atmosphere, leave the room without first performing the simple operation of turning off the valve? Even if he should have pictured such an episode, should he have further anticipated that such person would say nothing to anyone about the fact that the room was filling with gas? We think a requirement that a gas company should foresee and provide against such possibility would be unreasonably stringent. Weinke v. Philgas Co., 224 Wis. 78, 269 N.W. 532. Courtney followed standard procedure for this type of installation, with the possible exception of his failure to inform the owner, according to the only qualified testimony on the point. The witness who testified to the contrary was not acquainted with installations of the type involved here. We do not suggest that negligence may not exist even though a standard procedure be followed, but it is one factor to be considered. Seward v. Natural Gas Co. of New Jersey, 8 N.J. 45, 83 A.2d 716. We think the inference of negligence in this respect is not supported by the evidence.

 Assuming that Courtney should have notified appellee of the disconnected plate, we think the failure to do so in this case is irrelevant in view of the lapse of the three-week period during which Papen had ample opportunity to learn of the situation by simple inspection. Indeed, it is hard to believe that three laborers would live in these two rooms for three weeks with no cooking facility and without making a complaint, although all other residents had such a facility. Their failure to complain, if such be the fact, lends credence to the thought heretofore expressed that the disconnected plate was in some room other than No. 4.

In our view, the evidence is as consistent with lack of negligence or proximate cause as with the existence thereof. For this reason, the conclusion of liability on Suburban's part cannot be justified.

The judgment below will be reversed.

