**Wallace S. CROPPER, Jr. and Diane C. Cropper, his wife, Plaintiffs,**

v.

**REGO DISTRIBUTION CENTER, INC., et al., Defendants.**

Civ. A. Nos. 77–117, 77–194.

United States District Court, D. Delaware.

June 17, 1982.

John J. Schmittinger, and Douglas B. Catts, Schmittinger & Rodriguez, P. A., Dover, Del., for plaintiffs.

Michael N. Castle, Michael N. Castle, P.A., Wilmington, Del., for defendants Rego Co., Gloconda Corp., Bastian-Blessing Co. and Rego Distribution Center, Inc.

James T. McKinstry, Richards, Layton & Finger, Wilmington, Del., for defendants Swift Agricultural Chemical Corp.

Dennis D. Ferri, Becker & Ferri, P. A., Wilmington, Del., for defendant Pro Chem Co., Inc.

F. Alton Tybout, and Jeffrey S. Marlin, Tybout, Redfearn, Casarino & Pell, Wilmington, Del., for third party defendant Southern States Co-op.

Robert K. Payson, and Christopher J. Varner, Potter, Anderson & Corroon, Wilmington, Del., for third party plaintiff Penn Central Transp. Co.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Plaintiffs Wallace and Diane Cropper have brought suit against numerous defendants on a variety of negligence and breach of warranty claims because of injuries Wallace Cropper suffered when he was sprayed with anhydrous ammonia. Mr. Cropper's injury involved a structure known as an unloading riser which has become the focus of this lawsuit. It was built by defendant Pro Chem, Inc. ("Pro Chem") for defendant Swift Agricultural Chemicals Corporation ("Swift")[1] in 1971 and at the time of the accident incorporated an A7514 valve manufactured by defendant Rego Company ("Rego").[2] Jurisdiction is based on diversity of citizenship and the amount in controversy exceeds $10,000 exclusive of interest and costs. Presently before the

---

1. Swift is now known as Estech, Inc., but for the sake of simplicity and consistency the Court will continue to refer to "Swift."

2. Defendant Rego has had a rather involved corporate history which is set out in its amended answer to the complaint filed July 30, 1979. Docket No. 199. For the purposes of this mo-
tion, it is sufficient to note that Gloconda Corporation, Bastian-Blessing Company and Rego Distribution Center, Inc., are all affiliated with or subsidiaries of Rego. The name Rego or Rego Company will be used to refer to all of the individual corporations.

Court are defendants Pro Chem, Swift and Rego's motions for summary judgment.[3] In order to understand the Court's disposition of these motions, a certain amount of background information is required. Unless otherwise stated, the facts are either undisputed or taken in the light most favorable to plaintiffs, the non-moving party, as they must be on a motion for summary judgment. *See Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781 (3d Cir. 1978).

Anhydrous ammonia is a chemical fertilizer with a boiling point of -28° or -27° F. Although it is a gas at atmospheric temperature and pressure, it may be compressed to a liquid, the state in which it is generally handled. Contact with anhydrous ammonia in its liquid state is extremely dangerous. The accident occurred on May 21, 1975, while Wallace Cropper was working with the anhydrous ammonia system located at the Southern States Plant in Dagsboro, Delaware. The facility at Dagsboro was designed to unload anhydrous ammonia from truck or railroad tank cars and store it until it could be sold to farmers for use as fertilizer. The facility consists of a tank car unloading riser used to unload tank cars, storage tanks, and a field riser used to load the farmers' vehicles. At the time of the accident a fence enclosed all of the Dagsboro plant except the unloading riser. The anhydrous ammonia moved through the system in only one direction—from the tank car through the unloading riser and into the storage tanks for subsequent unloading through the field riser.

The unloading riser consists of a series of pipes, hoses, attachments, valves and a compressor which when attached to a tank car containing anhydrous ammonia permits the pumping and transportation of anhydrous ammonia from the tank car into the storage tanks. A central supporting pipe buried in the earth outside the fence supports two metal pipes which go through the fence surrounding the rest of the facility and

connect to the storage tanks and the compressor. The anhydrous ammonia in the tank cars is kept under pressure while being transferred to the storage tanks. Two hoses, one connected to each of the pipes described above, are needed to unload the tank cars. One hose, connected through the pipe to the compressor (pressure hose), applies pressure to the tank car forcing the liquid anhydrous ammonia to flow into the second hose (product hose) which is connected to the pipe leading to the storage tanks. Both the product and the pressure hoses are connected to the tank car by means of connector pipes.[4] Each connector has a small spigot-like valve which can be opened to allow the anhydrous ammonia to escape into the air, thus "bleeding" the system so that the operator can safely disconnect the hose.

At the time of the accident, the system also contained various valves to control the flow of anhydrous ammonia. At the end of the product hose which attached to the railroad car was a two-inch Rego angle valve model number A7514. As will become apparent, that valve is at the center of this controversy. The next valve in the system was another Rego shut-off valve located on the metal pipe. Closing that valve would trap anhydrous ammonia between it and the next valve downstream, a "back check" valve which prevented the anhydrous ammonia from flowing backwards through the system towards the tank car.

On the date of the accident, Mr. Cropper was preparing the system so his fellow worker could unload a tank car. He picked up the product hose and laid it on the ground; as he did so he was sprayed with anhydrous ammonia and sustained serious injuries. Although no one is certain how the accident occurred, plaintiffs' expert theorized that the presence of the Rego A7514 shut-off valve on the end of the product hose permitted the system to become a "wet

---

**3.** Defendant and third party plaintiff Penn Central Company and third party defendant Southern States Cooperative, Inc. are not involved in any of the motions currently pending. Nothing

in this opinion or the accompanying order is intended to affect their status.

**4.** These pipes have been variously described as swedge nipples, connectors or adaptors.

hose system." If there had been no valve on the end of the product hose, the operator's bleeding of the connector pipe would have emptied the hose all the way back to the valve on the metal pipe or if that valve were also open, the next closed valve in the system. Such a system is known as a "dry hose system" because, as its name implies, the hose is kept in a dry, *i.e.*, empty, state. The presence of the A7514 valve prevented an automatic bleeding of the hose. If the operator bled the connector pipe while the valve was closed, only the connector itself would be emptied; the hose would remain full. Plaintiffs argue that at the time of the accident there must have been anhydrous ammonia in the product hose which escaped as Mr. Cropper moved it and that but for the presence of the valve, the hose would had to have been empty.

As will be explained more fully, *infra*, plaintiffs also allege various subsidiary acts of negligence. Thus, for example, plaintiffs allege that the failure to provide a locking device on the A7514 valve to prevent its accidental opening was negligent. They argue that even if the riser was operated as a wet system, it would not have released the anhydrous ammonia if the A7514 valve had been locked closed. Plaintiffs also theorize that the facility may have been operated as a dry hose system at the time of the accident (there is a factual dispute on this point). If so then, they argue, there may have been tampering with the system. The absence of a fence and/or locks on the downstream valves which would have prevented such tampering is also claimed to be negligent. Nonetheless, plaintiffs' basic allegation is that the A7514 valve allowed the facility to become a wet hose system. Regardless of how the hose came to be filled or why the anhydrous ammonia escaped, the hose could not have held the anhydrous ammonia but for the A7514 valve.

As originally designed, the product hose did not have a shut-off valve on its end. There is a factual dispute on this point, but for the purposes of these motions both Swift and Pro Chem have conceded that each was responsible for the placement of the valve, that the placement was negligent

and made the system defective for the purpose of applying the theories of strict liability and breach of warranty. Plaintiffs assert that each of the defendants is liable to them under a variety of legal theories including breach of warranty, strict tort liability and negligence. Inasmuch as both the theories of recovery and the defenses raised vary with each defendant, it will be necessary to deal with each defendant separately.

### Pro Chem

As noted, for the purposes of this motion Pro Chem admits it installed the A7514 valve and constructed the facility. Plaintiffs argue that Pro Chem is liable under theories of strict tort liability, breach of warranty and negligence. Pro Chem raises a number of grounds for summary judgment, each of which will be discussed in turn.

### Mandatory Regulations

As a threshold matter, Pro Chem argues that it is entitled to summary judgment because even if it did install the riser system containing the A7514 valve, it did so in conformity with 29 C.F.R. § 1910.111 and the applicable industry standards. Recognizing that compliance with industry standards is not generally conclusive on the issue of negligence, Pro Chem asserts that the federal regulation in question amounts to a specific direction that the valve be placed on the end of a transfer hose when that hose is not drained. Given the Court's view of the regulation in question, it is unnecessary to reach the issue of whether under any circumstances it could immunize defendant's conduct. Insofar as they are relevant to this case, the industry standards are substantially the same as the federal regulation, which provides in part:

> (iv) Where hose is to be used for transferring liquid from one container to another, "wet" hose is recommended. Such hose shall be equipped with approved shut-off valves *at the discharge end.* Provision shall be made to prevent excessive pressure in the hose.

29 C.F.R. § 1910.111 (emphasis added). As the highlighted portion makes clear, both the regulation and industry standards refer only to the discharge end of an anhydrous ammonia system. The valve in question here was placed on the intake end of the hose of the unloading riser. Thus, whatever force Pro Chem's argument might have in a case involving an accident at the discharge end, it is inapplicable in this case.

### Strict Liability

Plaintiffs argue that Pro Chem is strictly liable for injuries resulting from the use of the defective product (the riser system) it placed in the stream of commerce. Inasmuch as this Court's jurisdiction is based on diversity the Court must apply the substantive law of Delaware, including that state's conflict of laws rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). As a general matter Delaware does not recognize the doctrine of *Restatement (Second) of Torts* § 402A strict tort liability in sales cases because of the preeminence of the Uniform Commercial Code ("U.C.C.") in that field of law. *Cline v. Prowler Industries of Md., Inc.*, 418 A.2d 968 (Del.1980) (en banc); *see Franchetti v. Intercole Automation, Inc.*, 523 F.Supp. 454 (D.Del.1981). Although plaintiffs advance several arguments as to why this case falls outside the general rule, the Court finds them all without merit.

█ Preliminarily, plaintiffs argue that the law of New Jersey rather than Delaware should apply to its claim against Pro Chem. It is undisputed that New Jersey recognizes the doctrine of strict tort liability in cases involving the sales of goods. The Court need not resolve the difficult issue lurking in plaintiffs' assertion, *i.e.*, whether a strict tort liability claim sounds in tort or contract for the purposes of choice of law, because under either characterization the Court concludes that a Delaware court would apply Delaware's substantive law.

The accident and plaintiff's injury occurred at the Dagsboro plant in Delaware. Similarly, Pro Chem constructed the facility at Dagsboro, Delaware, and although the record is unclear on the point, counsel agreed at oral argument that the Rego A7514 valve was added in Delaware. In *Friday v. Smoot*, 211 A.2d 594 (Del.1965), the Delaware Supreme Court specifically rejected the "most significant contacts" test of *Babcock v. Jackson*, 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963), and the *Restatement (Second) of Conflicts*, because it would generate too much uncertainty as to what law applied in tort cases. Thus, if plaintiffs' claim sounds in tort, a Delaware court would apply the law of Delaware—the place of injury. *Folk v. York-Shipley, Inc.*, 239 A.2d 236 (Del.1968).

Plaintiffs urge that *Cline's* recognition that strict tort liability is a hybrid of tort and contract, 418 A.2d at 976, requires this Court to apply contract choice of law rules. The Court finds it unnecessary to decide the correctness of plaintiffs' characterization of *Cline*, because even under Delaware's contract choice of law rules, Delaware law applies. Plaintiffs' claim against Pro Chem arises out of its role in the design and construction of the riser system, *i.e.*, out of its performance of its contract with Swift. Although the contract may have been accepted at Pro Chem's New Jersey office, no questions as to its interpretation, existence, or validity have been raised. *Cf. Norse Petroleum v. LVO International, Inc.*, 389 A.2d 771 (Del.Super.1978) (under Delaware law, law of place where contract is formed determines its existence and validity). The undisputed facts disclose that the riser was to be erected by Pro Chem in Delaware; thus, if plaintiffs' claim sounds in contract, a Delaware court would apply Delaware law. *Fairbanks, Morse & Co. v. Consolidated Fisheries Co.*, 190 F.2d 817 (3d Cir. 1951).

Plaintiffs argue that even if Delaware law applies, the contract between Swift and Pro Chem was a construction contract and therefore outside the coverage of the U.C.C. In *Martin v. Ryder Truck Rental, Inc.*, 353 A.2d 581 (Del.1976), the Delaware Supreme Court held that in enacting the U.C.C. the

legislature had not preempted the development of products liability law, at least in the context of a bailment-lease transaction. Although *Cline* severely limited the expansion of strict tort liability, it left intact the actual holding of *Martin*. That holding was quite limited; the Court simply applied strict tort liability in a bailment-lease situation. Several subsequent decisions of lower Delaware courts have held that the doctrine is limited to such situations. *See e.g., Demuth v. Dresser Industries, Inc.*, C.A. No. 80C–JA–83 (Del.Super. August 18, 1981) (O'Hara, J.); *Baker v. Oliver Machinery Co.*, C.A. No. 80C–JA–11 (Del.Super. April 19, 1981) (Stiftel, J.); *Wells v. Massey-Ferguson*, C.A. No. 430, 1975 (Del.Super. May 17, 1976) (Walsh, J.).

■ The Court, having jurisdiction by reason of diversity, must apply Delaware law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In a case such as this where the state's highest court has not yet addressed the precise issue presented, this Court must predict how that court would decide if it were confronted with the problem. *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 661 (3d Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). The decisions of lower state courts, doctrinal trends, analogous decisions, considered dicta, scholarly works and other reliable data may be consulted, but in the final analysis the Court's decision must be based on its best judgment as to the direction of the state Supreme Court. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165 (3d Cir. 1982); *Becker v. Interstate Properties*, 569 F.2d 1203, 1204–6 (3d Cir. 1977), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978); *Porter v. Hollander*, 494 F.Supp. 151 (D.Del.1980).

Each of the above-cited state court cases involved the sale of goods; hence, the U.C.C. was applicable even if, on the facts of some, no remedy was available. Those cases stand in stark contrast to the instant case, which, like *Martin*, involves an area of law not intended to be affected by the U.C.C. Read together, *Cline* and *Martin* stand for the proposition that the U.C.C. limits the expansion of the doctrine of strict tort liability only in cases involving contracts for the sale of goods. The Court therefore concludes that if presented with the issue, the Delaware Supreme Court would hold that the U.C.C. does not preclude the application of strict tort liability in a service context.[5]

However, that conclusion does not end the matter. Although the U.C.C. does not preclude the application of strict tort liability in this case, the rule of *Castaldo v. Pittsburgh-Des Moines Steel Co.*, 376 A.2d 88 (Del.1977), does. In *Castaldo* the Delaware Supreme Court adhered to the services-products distinction in the application of the doctrine of strict tort liability and held that "those who sell 'services' are not liable in the absence of negligence." 376 A.2d at 91. As explained by the Court of Appeals for the Third Circuit, such a distinction is based on the nature of professional services which do not ordinarily involve

> mass production of goods or a large body of distant consumers whom it would be unfair to require to trace the article they used along the channels of trade to the original manufacturer and there to pinpoint an act of negligence remote from their knowledge and even from their ability to inquire.

*LaRossa v. Scientific Design Company*, 402 F.2d 937, 942 (3d Cir. 1968) (applying New Jersey law). In short, the policy considerations summarized in *Martin* and relied on to

---

**5.** It should be noted that like most construction contracts, the contract at issue here is a combination sales/service agreement. Pro Chem agreed to both supply the parts and build the facility. Although it is unclear from the briefs, Pro Chem has apparently conceded that the contract should be treated as one for services rather than goods. *See* Defendant Pro Chem's Reply Brief at 5. (Docket No. 291). In any event, as the foregoing discussion indicates, if the agreement is considered to be a contract for the sale of goods, the application of strict tort liability is precluded by *Cline*.

justify the adoption of strict tort liability are not present in a case involving professional services. The Court therefore concludes that regardless of whether the contract between Pro Chem and Swift is considered to be one for the sale of goods or services, if presented with the issue, the Delaware Supreme Court would hold that the doctrine of strict tort liability of *Restatement (Second) of Torts* § 402A is unavailable on the facts of this case.

■ Plaintiffs also argue that Delaware recognizes the "common law" strict tort liability of *Rylands v. Fletcher*, 3 H.L. 330 (1868). Although *Rylands'* doctrine of strict liability for ultrahazardous activities was slow to gain acceptance in this country, it is now accepted in most jurisdictions. *See* W. Prosser, *Handbook of the Law of Torts*, § 78 at 508–9 (4th ed. 1971). As embodied in *Restatement (Second) of Torts*, § 519, the doctrine provides:

> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
>
> (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

The above quoted passage is qualified by subsequent sections, particularly Section 520, which lists the factors to be considered in determining whether an activity is abnormally dangerous. *See Restatement (Second) of Torts*, § 519 Comment a. Even assuming the Delaware Supreme Court would hold the operation of an anhydrous ammonia facility to be an abnormally dangerous activity, Pro Chem cannot be held liable under the doctrine on the facts of this case because it did not operate such a facility. At most Pro Chem simply designed and built the facility which enabled Swift and later Southern States to carry on an abnormally dangerous activity. The fact that in so doing Pro Chem may have created an abnormally dangerous instrumentality, as plaintiffs argue, does not alter the fact that Section 519 liability attaches not to the creation of a dangerous product but to the operation of a dangerous activity. *See, e.g., Richmond v. Knowles*, 265 A.2d 53 (Del.Super.1970) (owner of vicious dog must keep it secure at his peril); *Catholic Welfare Guild, Inc. v. Brodney Corp.*, 58 Del. 246, 208 A.2d 301 (Del.Super.1964) (blasting held to be ultrahazardous activity); *cf. Suburban Propane Gas Corp. v. Papen*, 245 A.2d 795 (Del.1968) (operation of gas line is not an ultrahazardous activity; gas company is liable for injuries caused by its negligence but is not an insurer liable for injuries caused by its operation). Indeed, plaintiffs' construction of Section 520 to hold the manufacturer of an unreasonably dangerous chattel liable for any injuries incurred in its operation would in effect make its liability coextensive with Section 402A strict tort liability.

■ Although not necessary to the Court's holding, it is noted that the Delaware courts have been hesitant to extend its application for fear of strangling individual enterprise. *See Fritz v. E. I. DuPont De Nemours & Co.*, 45 Del. 427, 75 A.2d 256 (Del.Super.1950) (escaping chlorine gas). Although the owner of a dangerous instrumentality is bound to know its inherent risks and exercise a degree of care commensurate with the danger, he is not ordinarily held to be an insurer. *Suburban Propane Gas Co. v. Papen*, 245 A.2d 795 (Del.1968); *Hercules Powder Co. v. DiSabatino*, 55 Del. 516, 188 A.2d 529 (Del.1963). This case does not involve an activity being conducted in an inappropriate location, *Catholic Welfare Guild, Inc. v. Brodney Corp.*, 58 Del. 246, 208 A.2d 301 (Del.Super.1964) (blasting in a city), or totally lacking in social utility, *Richmond v. Knowles*, 265 A.2d 53 (Del.Super.1970) (keeping a vicious dog). Rather, plaintiffs have alleged that in constructing the anhydrous ammonia facility defendants failed to exercise the degree of care commensurate with the dangers inherent in its operation. If that in fact is the case, Pro Chem may be liable for plaintiffs' injuries. However, the Court concludes that if presented with the issue, it is extremely unlikely that the Delaware Supreme Court would extend the doctrine of *Rylands* to cover this situation.

### Breach of Warranty

■ Inasmuch as the contract between Swift and Pro Chem is a hybrid sales/service agreement, there is considerable doubt as to whether the provisions of Article 2 of the U.C.C., which govern only contracts for the sale of goods, are applicable to the transaction between Swift and Pro Chem. As before, however, the Court need not reach that issue because the undisputed facts disclose that Pro Chem completed all work on the anhydrous ammonia facility in 1971. Mr. Cropper's injury occurred in 1975 and the original complaint was filed in 1977. The U.C.C.'s statute of limitations provides that an action must be brought within four years of when it accrues and that a "cause of action accrues when the breach occurs, *regardless of the aggrieved party's lack of knowledge of the breach.*" 6 *Del.C.* § 2–725(1), 2–725(2) (emphasis supplied). In *Johnson v. Hockessin Tractor, Inc.,* 420 A.2d 154 (Del.1980), the Delaware Supreme Court held that the Code's four-year statute of limitations governed actions for breach of warranty including those seeking recovery for personal injuries.

Plaintiffs' argument that the lack of contractual privity between themselves and Pro Chem precludes the application of 6 *Del.C.* § 2–725 was specifically rejected by the Delaware Supreme Court in *Johnson.* Moreover, the argument ignores the fact that 6 *Del.C.* § 2–318 provides that the Code's warranty provisions extend "to any natural person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty" thereby abolishing the privity requirement. The Court concludes that even if the U.C.C. were applicable, plaintiffs' warranty claims against Pro Chem would be barred by the statute of limitations.

---

**6.** Pro Chem also bases its argument on *Restatement (Second) of Torts* § 453 which delineates the functions of the court and jury in declaring the existence or nonexistence of rules which restrict an actor's liability. The division of function between court and the trier of fact in a diversity case must be determined as a matter of federal law. *Byrd v. Blue Ridge Electric*

### Negligence

#### Superseding Cause

■ Pro Chem argues that even if its design and/or installation of the unloading riser was negligent, the failure of both Swift and Southern States (Mr. Cropper's employer) to remove the A7514 valve was a superseding cause of plaintiff's injury relieving Pro Chem from liability. As a general matter of both Delaware and federal law, proximate cause is a jury issue which except in very rare cases is inappropriate for summary judgment. *Wyatt v. Clendaniel,* 320 A.2d 738 (Del.1974); *Island Express v. Frederick,* 35 Del. 569, 171 A. 181 (Del. 1934); *accord Merriweather v. E. W. Bliss Co.,* 636 F.2d 42 (3d Cir. 1980). If, however, there are undisputed facts which can compel reasonable persons to draw only one conclusion, summary judgment is appropriate. *Hercules Power Company v. DiSabatino,* 55 Del. 246, 188 A.2d 529 (Del.Super. 1963); *accord, Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402 (3d Cir. 1982).

Pro Chem's argument that summary judgment is appropriate in this case focuses primarily on the provisions of Section 452[6] of the *Restatement (Second) of Torts* which provides:

(1) Except as stated in Subsection (2), the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding cause of such harm.

(2) Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause.

■ Although the rule is articulated in the form of superseding cause, superseding

---

*Cooperative, Inc.,* 356 U.S. 525 (1958). As will be discussed in the text, the issue of superseding cause is actually a subdivision of the broader issue of proximate cause which must be decided by the trier of fact unless the court finds no serious issue of material fact to be presented. *Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d at 407.

cause can perhaps best be understood as a species of proximate cause. *See Schreffler v. Birdsboro Corp.*, 490 F.2d 1148, 1154 (3d Cir. 1974) (same facts may furnish the basis for either doctrine and the result will be the same under either). The basic question which must be answered is whether, on the basis of the undisputed facts, a reasonable person in Pro Chem's position could have foreseen that the unloading riser system would be operated for four years[7] by persons knowledgeable[8] about such facilities without any of the modifications which could have prevented the accident being made. Although neither Court nor counsel have discovered any Delaware cases which rely on section 452, the standard which has actually been applied by the Delaware courts is much the same. In *Surburban Propane Gas Corp. v. Papen*, 245 A.2d 795 (Del.1968), plaintiff alleged that the explosion of gas and resulting fire which partially destroyed its building resulted from defendant's negligence. Defendant, a gas company, had previously serviced the gas cooking system installed in plaintiff's farm labor camp. During its examination defendant discovered one of the gas hot plates was defective. Defendant removed the defective plate and plugged the gas line with a screw but left the defective plate in the room. Although the facts were disputed, plaintiff contended that the explosion occurred when one of the transient farm workers attempted to reconnect the defective plate. Plaintiff argued that defendant was negligent, *inter alia*, because only the inside gas valve was closed when the hot plate was disconnected, the outside valve was left in the open position. If the outside valve had been closed or if the defective hot plate had been removed, plaintiff asserted

the accident could not have occurred. Assuming *arguendo* plaintiff's version of the facts, the Delaware Supreme Court held that they could not support a finding of negligence. The Court explained that it would be unreasonable to require defendant to foresee and provide against the possibility that someone might "unscrew the ... plug, turn on the inside valve and then when the odor of gas began to permeate the atmosphere, leave the room without first performing the simple operation of turning off the valve." 245 A.2d at 799.

Similarly in *Hercules Powder Company v. DiSabatino*, 55 Del. 516, 188 A.2d 529 (Del. 1963), a contractor's employee was electrocuted when he grasped a guy wire attached to a pole on defendant's land. As installed the guy wires were properly insulated and completely safe. The wires had been cut, probably that morning or the previous night, and defendant had had no notice of the dangerous condition. In reversing the trial court's denial of a directed verdict on the issue of negligence, the Delaware Supreme Court held "the test always resolves itself into the question of whether or not, as a reasonable man, [the defendant] has provided safely against all reasonably foreseeable acts of others, or combination of acts." 188 A.2d at 534. Simply stated, a defendant cannot be held negligent for failing to anticipate the extraordinary or unprecedented acts of others. *Id.*

For the purposes of this motion, the Court assumes both Southern States and Swift knew that anhydrous ammonia was a dangerous substance, and both knew that there were certain risks inherent in operating a wet system; however, that knowledge is not sufficient to isolate Pro Chem (for purposes of this motion), the designer of the

---

7. Although the system was in place for four years, the anhydrous ammonia season only lasts from mid-March to mid-June each year. Construction was completed in April 1971 and the accident occurred in May 1975; thus, the riser was actually operated for less than twelve months.

8. In their brief, plaintiffs vigorously dispute the extent of Southern States' knowledge. The record indicates that although he had never worked with a wet system, which is very rare,

Mr. W. Chase Coale, a Southern States' employee and technical adviser, had extensive experience with anhydrous ammonia systems in general and was fully aware of the possible dangers involved in operating a wet system. *See* Coale Deposition, Docket No. 228. Given the Court's view of the case, this issue need not be resolved at this time. For the purposes of these motions, the Court will assume Mr. Coale was knowledgeable about wet systems.

system, from liability. Plaintiff alleges several defects in the system, among them the failure to remove the A7514 valve; the lack of a locking device on the A7514 valve to prevent its accidental opening; the lack of a fence enclosing the riser system; and the lack of a lock on the shut-off valve located on the metal pipe. No one is certain exactly how the accident occurred but plaintiffs allege it could not have happened if these design modifications had been made. As noted, plaintiffs theorize that the hose was either left overnight loaded with anhydrous ammonia or tampered with during the evening and filled. In either case, if the A7514 valve had been removed or locked shut the accident could not have occurred. If plaintiffs' second theory, that the system was tampered with, is correct, a fence and/or a lock on the second valve could have prevented an intruder from filling the hose. In order to grant Pro Chem's motion the Court would have to conclude that a jury could not reasonably find that a person having designed and installed such a system without locks[9] or fences and with the valve should foresee the possibility that his client or a third party might continue to operate that system as designed, i.e., without fences, locks, or removing the A7514 valve, for a period of four years. The Court concludes that Pro Chem's motion for summary judgment based on the doctrine of superseding cause must be denied.

*Duty to Warn*

■ As stated in *Wilhelm v. Globe Solvent Co.*, 373 A.2d 218, 223 (Del.Super.1977), "[a] duty to warn arises when a manufacturer or seller of a product which, to his actual or constructive knowledge, involves danger to users, places the product on the market." Pro Chem argues that the duty "exists only when those to whom the warnings would go can reasonably be assumed to be ignorant of the facts which a warning would communicate." *Wilhelm v. Globe Solvent Co.*, 373 A.2d at 223 (citing *Burton*

*v. L. O. Smith Foundry Products Co.*, 529 F.2d 108 (7th Cir. 1976)). Pro Chem's assertion that both Swift and Southern States knew of the existence of the A7514 valve misses the point. The issue which must be decided by the trier of fact is whether Swift and Southern States knew of the danger that, absent locking devices or fences, anhydrous ammonia could become trapped to be subsequently released in an unexpected manner. Moreover, even if Swift and Southern States knew of the danger, there is considerable evidence which indicates that Mr. Cropper did not. Giving a warning to third persons such as Swift or Southern States "is merely a means by which this information is to be conveyed to those who are to use the chattel." *Restatement (Second) of Torts* § 388 comment n. The reasonableness of that means varies with the dangerousness of the article. Although the court in *Wilhelm* stated "if the manufacturer has no duty to warn a purchaser who is aware of the product's danger, the manufacturer has no duty to warn the employee of such purchaser," 373 A.2d at 223 (quoting 63 *Am.Jur.2d Products Liability* § 47), its actual holding was based on two other grounds. First, it is apparent that the plaintiff in *Wilhelm* had actual knowledge of the danger involved; and second, the defendants had no control over the work area where the warnings would have to have been posted. In contrast, in this case, not only is the extent of Mr. Cropper's knowledge in dispute, but Pro Chem could have posted warnings on the riser system itself. The determination of whether its failure to do so was negligent under the circumstances is one of fact and not amenable to summary judgment. *Dougherty v. Hooker Chemical Corp.*, 540 F.2d 174 (3d Cir. 1976).

*Swift*

In August 1973, Southern States purchased the unloading riser from Swift and

---

9. In this regard it should be noted that though there is evidence to suggest that the A7514 valve was installed at the suggestion of Richard P. Hess, who was then a Swift employee, the record merely indicates he suggested that some type of shut-off valve be included. Hess Deposition at 61, Docket No. 253. A jury could reasonably conclude that even if Swift decided to install a valve, the decision as to the type of valve to be installed, *e.g.*, locking versus nonlocking, was left to Pro Chem.

continued to operate the system until the date of Mr. Cropper's accident. During that time, changes were made in that additional anhydrous ammonia storage tanks were installed but the riser system itself, including the A7514 valve on the product receiving hose, was unaltered. Swift makes many of the same arguments as Pro Chem, but certain factual variations require separate treatment.

*Strict Liability*

■■■ Swift's sale of the riser system to Southern States took place in Delaware, thus regardless of whether Swift is considered independently or as a link in Pro Chem's chain of distribution, the doctrine of strict tort liability is unavailable for the reasons previously set forth. Similarly, the analysis of plaintiffs' common law strict liability claim against Pro Chem applies to Swift as well. At the time of the accident, Southern States, not Swift, was operating the facility. Swift was merely the vendor of an instrumentality which arguably permitted Southern States to carry on an abnormally dangerous activity. As previously explained, the doctrine of *Rylands* does not extend liability to any but those who conduct dangerous activities.

*Breach of Warranty*

Swift's sale of the completed riser system to Southern States in 1973 places it within the ambit of the Uniform Commercial Code. Plaintiffs allege that Swift breached its express warranty, as well as the implied warranties of merchantability and fitness for a particular purpose. Swift argues that it is entitled to judgment as a matter of law on all three theories.

*Express Warranty*

■■■ The only direct evidence in the record on the issue of express warranty is contained in the deposition testimony of W. Chase Coale who contacted Swift on behalf of Southern States. He testified that his only contact was with Mr. Jerry Christian, a "sales-manager-type" as opposed to a "technical man." Mr. Coale had no recollection of any specific discussions with Mr. Christian on subjects other than the availability

and price of the facility in general. Indeed, Mr. Coale testified that there was no question in his mind that he (Mr. Coale) knew how the type of facility in question functioned. Coale Deposition at 186–90, Docket No. 228. Plaintiffs argue "that during the course of the discussions Mr. Coale discussed with Swift representatives particular functions of the anhydrous ammonia system" and that "Swift must have represented the condition of the anhydrous ammonia system, and that became the basis of the bargain." *Plaintiffs' Brief in Opposition to Swift's Motion for Summary Judgment*, at 58–59, Docket No. 279. Yet they cite no support in the record for their argument. Although a party moving for summary judgment bears a heavy burden, a party opposing such a motion may not rely on speculative legal conclusions unsupported by documentation of specific facts. *Securities and Exchange Commission v. Bonastia*, 614 F.2d 908 (3d Cir. 1980). Measured by that standard, plaintiffs' response to Swift's express warranty argument is insufficient.

*Warranty of Merchantability*

■■■ Swift argues that the implied warranty of merchantability, 6 *Del.C.* § 2–314, is not applicable to the facts of this case which it characterizes as an isolated sale of used equipment. Section 2–314 provides in part: "Unless excluded or modified . . . , a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." In order to be liable for breach of an implied warranty of merchantability, Swift must be found to be a "merchant" within the meaning of section 2–314. The term "merchant" is defined in 6 *Del.C.* § 2–104 as:

> a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds

himself out as having such knowledge or skill.

Swift asserts that the official comments to U.C.C. Sections 2–104 and 2–314 indicate that the definition of "merchant" is more narrowly defined for purposes of section 2–314 as one who deals in goods of the kind. The Court agrees that a narrower definition of merchant applies to section 2–314. It is, however, no aid to Swift. Comment 3 to section 2–314 provides that "[a] person making an isolated sale of goods is not a 'merchant' within the meaning of the full scope of this section and, thus, no warranty of merchantability would apply." Taken in isolation, comment 3 would seem to support Swift's position, but that comment must be read in conjunction with comment 2 to section 2–104 which recognizes that section 2–314 implies a warranty of merchantability only "if the seller is a merchant with respect to goods of that kind." Reading that qualification back into the language of section 2–104, comment 2 notes that it "restricts the implied warranty to a much smaller group than everyone who is engaged in business and requires a professional status as to particular kinds of goods." Therefore a merchant within the meaning of section 2–314 is one who regularly deals in goods of the kind involved or otherwise has a professional status with regard to the goods involved such that he or she could be expected to have specialized knowledge or skill peculiar to those goods. The narrowing effect of section 2–314 is to exclude business people generally, who have only a general knowledge of industry practices, from the class of merchants for the purpose of establishing liability for a breach of an implied warranty of merchantability.

■ Given that definition of the term "merchant," the Court need not address the parties' contentions as to the extent of Swift's experience with the sale of anhydrous ammonia riser systems. Although Swift draws a distinction between knowledge of anhydrous ammonia, which it does not deny, and knowledge of anhydrous ammonia riser systems, the Court is not prepared on a motion for summary judgment, to hold that a jury could not reasonably conclude that Swift had specialized knowledge or skill peculiar to anhydrous ammonia riser systems. To give but one example of the factual disputes involved: Swift argues that its hiring of Pro Chem to install the system conclusively demonstrates its lack of specialized knowledge. Yet there is evidence that Swift proposed the addition of a shut-off valve to the product hose and there are further factual disputes as to whether the valve was installed in implementation of the proposal and who installed it. Moreover, Pro Chem alleges that the basic system was set out in a blueprint provided by Swift to Pro Chem. A jury could conclude, based on these considerations, that Swift had the requisite specialized knowledge and merely hired Pro Chem to do the actual labor. Swift's motion for summary judgment predicated on the absence of a warranty of merchantability will be denied.

*Warranty of Fitness*

■ Swift argues that Southern States relied on the expertise of W. Chase Coale, its employee, in purchasing the Dagsboro facility rather than Swift's skill and judgment. A warranty of fitness for a particular purpose will, of course, only be implied where a "seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." 6 *Del.C.* § 2–315. Mr. Coale did inspect the Dagsboro plant and recommended it to his employers as an excellent purchase. Although plaintiffs hotly contest Mr. Coale's qualifications, as noted previously, the Court can assume his expertise for the purpose of the present motions. Although Mr. Coale did inspect the Dagsboro plant, it is unclear whether that inspection included a safety evaluation. At his deposition, Mr. Coale testified that he would not characterize his trip as a safety inspection. His primary goals were to see if the plant was worth the price being asked, to evaluate its installation and construction in terms of operation and industry standards, and to familiarize his superior

with anhydrous ammonia facilities. Coale Deposition at 105–06, Docket No. 228. Yet he also testified that he did have authority to make recommendations about safety features at the plant. Coale Deposition at 258.

During his inspection Mr. Coale did notice the A7514 shut-off valve on the product hose. Although he did think such an installation somewhat unusual, he thought it to be an acceptable option when properly operated. Coale Deposition at 45. Mr. Coale also testified that:

> There is only one reason for it [the A7514 valve] even being there in the first place, which is to unhook a partially-unloaded tank car. There is absolutely no other reason for it ever being there. And because of the physical layout of the Dagsboro facility it was deemed necessary by local personnel to apparently disconnect a partially-unloaded tank car of anhydrous ammonia.

Coale Deposition at 255. Although the above-quoted statement was probably referring to Southern States' personnel, other similar statements refer to Swift's operation. *See* Coale Deposition at 46.

When Mr. Coale's testimony is read together with that of Mr. Joseph A. Kollock, a principal of Coastal Supply Company, a commission agent for Swift, the factual dispute becomes apparent. Mr. Kollock testified that so few freight cars came to Dagsboro that there was never a reason to disconnect the unloading riser. Kollock Deposition at 37–38, Docket No. 233. Based on this evidence and all the reasonable inferences which could be drawn therefrom, a jury could conclude that Mr. Coale was in fact relying on Swift's expertise in evaluating the desirability of the A7514 valve.

Swift also argues that even if implied warranties existed, their breach was not a proximate cause of plaintiff's injury. Swift asserts that the alleged defect was patent and Southern States was fully aware of it before it purchased the system. The Court disagrees. As previously explained, the defect alleged was not simply the presence of the A7514 valve, but its presence without locks or an enclosure. Although Southern States was aware of the valve itself, it is not certain that it was fully aware of either the dangers it created, or, for that matter, its limited utility given Mr. Kollock's description of the system's operation. Swift's motion for summary judgment based upon the non-existence of a warranty of fitness for a particular purpose will be denied.

*Negligence*

*Superseding Cause*

Swift acknowledges that for the purposes of this motion the Court must assume that the placement of the A7514 valve on the product hose was negligent and that Swift was responsible for that placement. As does Pro Chem, Swift argues that the sale to Southern States relieved it of all liability for its negligence. Inasmuch as a much shorter lapse of time is involved, Swift's argument has considerably less force than Pro Chem's and it must be rejected for the same reasons.

*Rego*

Rego Company manufactured the A7514 valve which was placed on the end of the product hose. Although plaintiffs alleged various causes of action against Rego, they abandoned all but two at oral argument. Plaintiffs argue that the A7514 valve, which was intended for use with anhydrous ammonia, should either have been equipped with a locking device or Rego should have placed a suitable warning in its catalog. It is undisputed that Rego had no role in the design or construction of the riser system. It simply manufactures valves of various types and advertises them in a catalog. The catalog itself lists the A7514 valve on one page with other A7500 series valves and gives its specifications. On the following page Rego advertised a "New Valve Lock Sleeve Assembly" for use with, among others, two inch angle valves such as the A7514. Given this factual background, plaintiffs' argument must be reduced to a claim either that Rego cannot build valves and provide separate locking mechanisms, or that the locking mechanism must be advertised or otherwise referred to on the page with the valve itself.

**1156**

It is well established that a manufacturer who merely supplies a component part subsequently assembled by another in a manner creating a dangerous condition is not liable to one injured thereby. *See Castaldo v. Pittsburgh-DesMoines Steel Co.,* 376 A.2d 88, 90 (Del.1977). Plaintiffs do not allege that the A7514 valve was defective in any way; they merely claim that it should not have been used as it was. Assuming they are correct, the error was not Rego's. A manufacturer of component parts cannot be expected to foresee every possible misuse to which those parts might be put. Rego provided its purchasers with a range of products to fit a variety of needs. Included in that range was the very product plaintiffs argue should have been used. The Court concludes that a jury could not reasonably find Rego negligent in either manufacturing the A7514 valve without a built-in locking mechanism or failing to cross reference the locking system which was advertised on the next page of the catalog.

Rego has also argued that if its motion for summary judgment were granted, it would be entitled to a dismissal of the cross-claims pending against it filed by Swift and Pro Chem. Neither party has contested that assertion which is supported by the relevant case law. *See ICI America Inc. v. Martin Marietta Corp.,* 368 F.Supp. 1148 (D.Del.1974). Rego's motion for summary judgment will therefore be granted in its entirety and the cross-claims against it dismissed.

*Conclusion*

To summarize the foregoing, Pro Chem's motion for summary judgment will be granted as to plaintiffs' claims under the doctrine of strict tort liability and for breach of warranty. Swift's motion for summary judgment will be granted as to plaintiffs' claims under the doctrine of strict tort liability and for breach of express warranty. Rego's motion for summary judgment will be granted in its entirety. Remaining are plaintiffs claims against Pro Chem for negligence and failure to warn; and against Swift for breach of the implied warranties of fitness for a particular purpose and merchantability as well as for negligence and failure to warn.