In the Matter of L. B. TRUCKING, INC., Double D Farms, Inc., Dudley B. Durham, Jr. and Barbara L. Durham, Debtors.

SOUTHERN STATES COOPERATIVE, INCORPORATED, t/a Southern States Middletown Service Cooperative, a corporation of the Commonwealth of Virginia, Plaintiff,

v.

TOWNSEND GRAIN AND FEED COMPANY, a corporation of the State of Delaware, Dudley B. Durham, Jr., and Barbara L. Durham, Defendants.

Bankruptcy No. 83–438.
Adv. No. 84–15.

United States Bankruptcy Court,
D. Delaware.

Feb. 3, 1994.

James T. Vaughn, Jr., John Williams, Dover, DE, for plaintiff.

James L. Patton, Jr., Laura Davis Jones, Teresa C. Fariss, Wilmington, DE, for trustee.

### MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

Dudley B. Durham, Jr. and Barbara L. Durham, husband and wife, and their farming and trucking corporations, Double D Farms, Inc. and L. B. Trucking, Inc. filed

Chapter 11 petitions on December 20, 1983. Later, these cases were consolidated. The Durhams originally filed their petitions to avoid as a preferential transfer a crop lien held by Southern States. However, due partially to the Durhams' dismal 1983 harvest and substantial prepetition debt, the debtors were unable to propose a plan of reorganization. On March 5, 1985, the Chapter 11 case of the consolidated debtors was converted to a Chapter 7 case. James L. Patton was appointed Trustee of the Chapter 7 estate.

At the time of trial this adversary proceeding involved a claim by Southern States Cooperative, Inc. (Southern States) for monies owed in connection with its sale and application of herbicides and other chemicals on the Durhams' farm fields. The Trustee was pursuing the Durhams' counterclaims contending that these herbicides were negligently misapplied and also breached the various UCC warranties which caused severe crop damage to the Durhams' 1983 harvest. In addition, the Trustee contended that Southern States intentionally interfered with the Durhams' contractual relations with their grain elevator, Townsend Grain and Feed (Elevator) by not releasing a crop lien which effectively froze all the Durhams' available funds; consequently, the Durhams filed their bankruptcy petitions to avoid the lien, and the Trustee contends that Southern States' motive was to drive the Durhams out of the family farming business after causing the devastating crop damage earlier.

The procedural posture of this adversary proceeding is tortured. On February 2, 1984, Southern States sued Elevator for $25,000 in state court based upon an alleged security interest in crops the Durhams had placed with Elevator. The Durhams sued Southern States in bankruptcy court to avoid as a preference the lien which was the basis for Southern States' action against Elevator. The state action was removed to bankruptcy court on March 8, 1984. On March 14, in Judge Balick's absence, Judge Stapleton entered an order avoiding the lien and directed Elevator to turn over all monies in its possession to the Durhams.

Despite the finality of Judge Stapleton's order, the parties persisted in ignoring its existence. In May and June 1984, Elevator moved to dismiss the action that had been removed from state court and Southern States moved to remand it to state court. Both motions were denied; the March 14 order disposed of Southern States' claims to the $25,000 held by Elevator, therefore, Southern States was not entitled to remand; but Elevator was not entitled to a dismissal because the Durhams obviously had an interest in the $25,000 which Elevator had retained. It was after the parties could not resolve the manner in which the Durhams were to be made parties that the court directed Southern States to do it by amending its complaint.

Southern States then filed an amended complaint which repeated as Count I the language of its state court action against Elevator and added as Count II its claim in the amount of $70,071.40, incorporating by reference its proof of claim filed April 24, 1984. The Durhams answered and counterclaimed for breach of implied warranty of fitness for a particular purpose, negligence, tortious interference with and slander of credit and crossclaimed against Elevator. Elevator responded and crossclaimed against the Durhams. Finally, Southern States answered Durhams' counterclaim on November 1, 1984. On December 24, 1986, Elevator deposited the $25,000 into a registry account with the court.

Following conversion to Chapter 7, the Trustee and Southern States engaged in lengthy discovery. On January 28, 1987, Southern States moved to dismiss the Durhams' counterclaim, or alternatively, for a determination under 28 U.S.C. § 157(b)(3) that the counterclaim was not a core proceeding and, thus, the court should permissively abstain pursuant to 28 U.S.C. § 1334(c)(1). This court issued a Memorandum Opinion and Order denying Southern States' motion on June 9, 1987. *See Southern States Cooperative, Inc. v. Townsend Grain & Feed Co. (In re L. B. Trucking, Inc.),* 75 B.R. 88 (Bankr.D.Del.1987). In addition, the court granted the Trustee's motion to amend the counterclaim on March 27, 1987. After denial of Southern States' motion to dismiss, trial was originally set for

June 6, 1988 with a discovery cutoff date of April 30, 1988. Finally, Southern States moved for partial summary judgment on the intentional interference with contract claims which was denied by the court on August 8, 1988. *See Southern States Cooperative, Inc. v. Townsend Grain & Feed Co. (In re L.B. Trucking, Inc.)*, 90 B.R. 81 (Bankr.D.Del. 1988). As the trial date approached, the parties requested and leave was granted to sever the issue involving the $25,000 originally held by Elevator. Trial was held November 28 through December 2, December 5, December 27, 1988 and concluded January 4, 1989.

After consideration of the relevant facts and the applicable law, the court concludes that Southern States is not entitled to any recovery and that the Trustee, on behalf of the consolidated debtors' estate, is entitled to recover in full on its products liability claims, but not on its interference with contractual relations claim.

*Background*

Dudley Durham, Jr. has been a farmer most of his life and has been farming on his own since 1972. Durham leased most of the farmland he cultivated and handled most of the planting and other farming operations himself while his wife, Barbara Durham, maintained the farm business' books and records. Before 1972, Durham worked for his father, Dudley Durham, Sr., who has since retired; however, the elder Durham still assisted his son in various farming capacities such as overseeing the planting procedures and monitoring crops. In addition to the farming operation, Dudley and Barbara Durham also ran a trucking business from September 1981 to around March or April of 1983. The trucking operation utilized five trucks, but the business never generated a profit.

The facts leading to this controversy arise from the Durhams' dealings with Southern States concerning the planting of their 1983 crops. Southern States is a farmers' cooperative that engages in the business of supplying farmers with various agricultural supplies like seed, fertilizer, feed, herbicides, and other farm products as well as certain services in connection with these products. Southern States' operation covers most of the mid-Atlantic region, including Delaware. Durham had done business with Southern States before switching to Flo–N–Gro, Inc. as his supplier, but due in part to the substantial debt accumulated to Flo–N–Gro and other creditors, Durham approached Southern States once again prior to planting his 1983 corn and bean crops.

In April of 1983, Durham contacted Richard Thomas, the Southern States Middletown store manager, about arranging for the application of herbicides. Durham planned to use "no-till" farming for most of his 1983 crops. The "no-till" farming procedure does not require plowing or disking of the ground like the conventional plow mode of farming; instead, the farmer kills and controls weeds through the application of herbicides and then plants the seed with a special planter machine designed to plant in untilled soil. Durham apparently had done "no-till" farming in 1980, but did not personally apply the chemicals because he feared the potential health risks. Some of the advantages of "no-till" farming include preserving the moisture in the soil and saving money on the use of farm machinery, but overall there are greater expenses for the costs of necessary herbicides; additionally, in fields where a lot of stalks and debris exist from the harvest, conventional farming is required to stir up the soil and clear out the debris. In any event, Durham explained to Thomas that he wanted to use "no-till" farming for most of his 1983 corn and bean crops and discussed credit terms generally regarding the chemicals. At this initial meeting, Thomas extended to Durham a $2,000 line of credit to purchase starter fertilizer known as "10–24–0" to begin his corn planting. Nevertheless, Thomas told Durham that a crop lien would be necessary for additional credit on the rest of the needed chemicals.

Subsequently, on May 5 or 6, 1983, Durham met Thomas again, this time accompanied by his father. The elder Durham signed a credit application with Southern States so that he might guarantee any credit extended to his son. During this meeting, the younger Durham told Thomas words to the effect of "Richard, you know I'm trying

to pay, get straightened around and get all my stuff straightened around. I want it done the cheapest way, the best way it can be done." In response, Thomas replied, "Will do." The two Durhams and Thomas then went into a small room of the Middletown store where Thomas outlined with some specificity the herbicidal chemicals he proposed to use on Durham's fields. Thomas stated that water would be employed as a carrier for the herbicides with nitrogen being applied by drop nozzling at a rate of 150 lbs. per acre after the crops were standing. The alternative to using a water-based carrier for the chemicals would be to use a 30% nitrogen solution which was more expensive than using water as a carrier and violated the recommendations of the University of Delaware's Department of Agriculture. The junior Durham had no experience or expertise on herbicidal chemicals and relied on Thomas' briefing on the various herbicide mixtures in choosing which ones to apply. Yet, the younger Durham did emphasize to Thomas that a large number of acres per day would require spraying in order to keep up with Durham's heavy planting schedule. Thomas answered that the 1983 season was a normal year in terms of the number of acres to be sprayed by Southern States, and in most instances, Southern States was able to keep up with the farmers.

Durham actually began planting his crops a few days before his early May meeting with Thomas. Gilbert McClements, the principal Southern States herbicide applicator for Durham's fields, began spraying on May 8, 1983. The chronology of the planting and herbicide spraying on the respective Durham farms may be summarized as follows:

| | |
|---|---|
| May 3, 1983 | Plant at Home farm (corn—conventional, beans—no-till) |
| May 4 | Plant at Home farm, Plant at Carter farm (corn—no-till) |
| May 8 | Spray at Home and Carter farms |
| May 9, 10, 11 | Plant and Spray at Carter farm |
| May 12 | Plant at Pearsons farm (corn—no-till), Plant at Selvaggio farm (corn— no-till, beans—no-till, except 22 acres of conventional beans), Plant at Foard farm (corn—no-till), Plant at Brown farm (corn—no-till) Plant at duPont farm |
| May 13 | Plant at Armstrong's Corner (corn—no-till, beans—no-till) |
| May 14 | Plant at Paxton (Roller Rink) farm (corn—no-till), Spray at Carter farm (20 acres), Selvaggio farm (10 acres) |
| May 20 and 21 | Spray at Foard farm, Brown farm, duPont farm, Armstrong farm, Government farm |
| May 23 and 24 | Plant at Moody farm (corn—conventional) |
| May 25 | Plant at Paxton (Roller Rink) farm |
| May 26 | Plant at Roemer farm (corn—no-till) and Wood farm (corn—no-till) |
| May 27 | Plant at Wood farm |
| June 3 | Spray Moody farm and respray Home farm |
| June 6 | Replant and respray at Paxton farm |
| June 7 | Replant at Armstrong and duPont farms |
| June 8 | Replant at duPont and Brown farms |
| June 9 | Replant at Foard farms |
| June 10 | Respray Brown, duPont, and Foard farms |
| June 13 | Plant at Armstrong's Corner (beans—no-till) and Spray 20 acres |
| June 14 | Plant at Selvaggio farm (beans), Plant at Hartley (corn—no-till) and Spray Hartley and Paxton farms |
| June 15 | Plant at Hartley Farm (beans—no-till) |
| June 17 | Plant at Old Baltimore Pike (beans) |
| June 25 | Respray Moody Farm (20 acres) |
| June 26 | Spray Old Baltimore Pike Farm |

| | |
|---|---|
| June 27 | Respray Hartley farm |
| June 28 | Spray Old Baltimore Pike farm |
| June 29 | Replant Paxton farm Respray Moody Farm (20 acres) |
| July 11, 12, 13 | Plant at Home farm (beans) |
| July 14 | Plant at Selvaggio farm (beans) |
| July 21, 23, 25 | Spray Home and Selvaggio farms Spray Hartley farm (beans) |

In sum, Durham's 1983 farming operation consisted of roughly 740 acres of corn, about 230 acres of beans, and a winter wheat crop.

As to the herbicidal chemical applications by McClements, spray tickets were issued by Southern States detailing the job date, location, approximate acreage, and the various chemicals used in each application. McClements received instructions concerning which chemicals to apply from his superiors at Southern States, namely, Mr. Thomas and Mr. Fox. McClements would mix the herbicides each day prior to spraying, but apparently did not make extensive prespraying inspections of the grass and weeds nor did he perform a "hands and knees" inspection of the planted corn prior to spraying.

After planting the corn and bean crop, Durham observed a significant number of weeds and grasses that had escaped the herbicidal treatment and the correspondingly low crop population. Durham promptly notified Southern States of these difficulties. On June 1, 1983, Thomas visited several of Durham's fields and indicated to Durham that Southern States would remedy the problem. As a result, numerous acres were resprayed by Southern States and fields with very low plant populations were replanted (see chronology). Nevertheless, the 1983 corn and bean harvest was dismal and far below the County average.

When Durham commenced his harvest of the corn and bean crops in the Fall of 1983, Elevator would not release funds for payment for the delivered grain due to Southern States' crop lien. The security agreement creating this lien referred to Durham's debt for products and services provided by South-

ern States and was executed on September 12, 1983. Thomas had presented Mr. and Mrs. Durham with the security agreement and financing statement which they voluntarily signed even though they refused to sign a note for $62,000 because there was no substantiation for the amount. The crop lien was duly recorded on September 26, 1983. Still, no definite or final bill was presented to Durham and figures ranging from $20,000 to over $60,000 were subsequently discussed between the parties as the amount due.

Durham and his attorney, Thomas Runnels, began meeting with Thomas and other representatives of Southern States in the Fall of 1983 to resolve this dispute. At their first meeting with Thomas, Durham and Runnels were told that Durham's outstanding bill was $48,000 and the possibility of reducing the balance to $20,000 was discussed. Yet, a final figure on Durham's debt was never produced by Southern States after this meeting. Subsequently, Durham was visited in late October or early November by Thomas and Melvin Goad, operations supervisor, a middle level manager in the Southern States organization. Durham explained to Goad that the crop lien matter had to be resolved quickly so that he could complete his harvest and that Goad should contact Runnels. Shortly thereafter, Goad did contact Runnels to set up a meeting of Southern States' representatives to discuss Durham's problems arising from the herbicide application and the crop lien. In his telephone conversation with Runnels, Goad commented that Durham was not much of a farmer and that Durham's farming operation ought to be "closed down"; Runnels responded that Durham needed to resolve the crop lien issue soon to harvest his crops or he would be forced to file bankruptcy to avoid the lien and get his crops out of the field. A meeting was scheduled on November 4, 1983 at the Southern States Middletown Office.

At the November 4 meeting, Goad stated again that Durham was an incompetent farmer. This statement upset Durham who became angry; consequently, the meeting was briefly adjourned while Durham calmed down. After the meeting resumed, Runnels and Durham expressed their concerns over

Southern States' bill, including the apparent lack of a final figure. They explained the necessity of having the lien lifted so that funds could be released to pay Durham's landlords and other harvesting costs. John Larson, a regional credit manager for Southern States who attended this workout meeting, reassured Durham and Runnels that the problem could be resolved. In closing the meeting, the Southern States representatives agreed to review Durham's problem. Another meeting was scheduled for November 18, 1983. At that meeting, discussions had just gotten underway when Larson brought up the possibility of utilizing Southern States' insurance to cover Durham's alleged crop damage and Durham would be in the fields before Thanksgiving. Larson, who recollects only attending this meeting and does not remember any specifics of the discussion, stated that he probably made the comments about handling the problem through the insurance carrier to end the meeting on a "conciliatory" note. Subsequent to the November 18 meeting, neither Larson nor any representative of Southern States pursued the possibility of insurance or any other aspect of Durham's crop lien and crop damage problem. Durham was not back in the fields by Thanksgiving and, in fact, filed his petition roughly a month after the November 18 meeting, on December 20, 1983, in part, to avoid the Southern States' crop lien as a preferential transfer.

*Discussion*

The issues involved are: whether Southern States' herbicidal chemicals were negligently applied; whether Southern States breached UCC warranties and whether Southern States intentionally interfered with the Durhams' contract with Elevator by wrongfully asserting or overextending its crop lien. Collateral to the product liability claims, and asserted as an affirmative defense by the Trustee against Southern States' claim, is whether Southern States may recover payment for the chemicals and their application.

In addressing the various claims, the court will first examine the product liability claims concerning the herbicides before turning to the intentional interference with contractual relations.

*Product Liability Claims Against Southern States For Alleged Harm Resulting from Use of Its Chemicals*

■ Delaware does not have strict products liability arising out of the sale of goods. *Cline v. Prowler Indus. of Maryland, Inc.,* 418 A.2d 968 (Del.1980) (UCC warranty provisions on sales preempts judicial extension of strict liability in tort involving sale of goods). Consequently, those claiming injury from defective products in Delaware must seek recovery under a negligence and/or warranty rubric rather than a theory premised on strict liability in tort. *See Johnson v. Hockessin Tractor, Inc.,* 420 A.2d 154 (Del. 1980); *Wilhelm v. Globe Solvent Co.,* 373 A.2d 218 (Del.Super.1977). Since an action sounding in negligence requires some showing of fault, that is, the breach of a certain standard of care, whereas actions sounding in warranty do not, the negligence claim will be analyzed first.

*A. Negligence*

■ The Trustee argues that Southern States was negligent in its application of the herbicides to Durham's fields and that this negligence caused lost profits of $111,473.25 due to the resulting crop damage. Specifically, the Trustee points to the failure of Southern States' personnel, particularly McClements, to conduct necessary inspections and field tests prior to the herbicide spraying as well as misapplication of the herbicides, especially through using an improper carrier. In addition, the Trustee introduced the expert testimony of Dr. William Mitchell who stated that there was evidence, based on his examination of each and every application, that Southern States applied the wrong chemicals in certain instances. Southern States rebuts these contentions by asserting that it was customary practice in 1983 to employ nitrogen as a carrier despite horticultural research studies that revealed nitrogen would stimulate weed growth and curtailed the crops' root system. Moreover, on the other herbicide misapplication claims, Southern States merely contends that there was no proximate cause connecting its alleged conduct with the crop damage. Although the court ultimately rejects the proxi-

mate cause argument of Southern States and finds it liable under the breach of warranty analysis below, it must agree with Southern States that the Trustee has not shown negligence by a preponderance of evidence.

In any negligence cause of action, the plaintiff must establish that: (1) a duty was owed by the defendant, (2) that the duty was breached, (3) which was the proximate cause, (4) of damages. Prosser & Keeton, *The Law of Torts* § 30, at 164–65 (5th ed. 1984); Restatement (Second) of Torts § 281 (1979). In essence, negligence is the doing of some act which a person of ordinary prudence would not have done under similar circumstances. *Amoco Chemical Corp. v. Hill,* 318 A.2d 614, 617–18 (Del.Super.1974). In the present case, the Trustee has established the duty of Southern States to conform to a standard of care in its specialized area of applying agricultural chemicals to farmers' fields. Dr. Mitchell testified that McClements failed to conform to this standard omitting important pre-application tests to verify which chemicals should be applied. In addition, Dr. Mitchell testified that applying the nitrogen solution as a carrier violated University of Delaware recommendations to Southern States that it was an inappropriate carrier. Yet, because this case involves the intertwining of products and services, the Trustee's evidence supporting his negligence services claim really is more applicable to the breach of warranty claim. The fact that many of Durham's fields were resprayed tends to diminish the Trustee's position that the application of the herbicidal compounds directly caused the crop damage, especially when the crop damage occurring here was largely uniform (suggesting a broader source of the problem). Furthermore, though custom is not conclusive of the requisite standard of care, it is indicative of what is reasonable within a particular industry and, thus, the use of nitrogen as a carrier was not negligent in itself since that substance was still widely used in 1983. Overall, there is simply not enough proof to find that Southern States breached its duty of care to reasonably apply the herbicides.

## B. *Warranty*

The Delaware version of the UCC provides for three types of warranties arising from the sale of goods: (1) express warranties, 6 *Del.C.* § 2–313, (2) implied warranties of merchantability, 6 *Del.C.* § 2–314, and (3) implied warranties for a particular purpose, 6 *Del.C.* § 2–315. These warranties are mutually exclusive and independent of one another but each type of warranty may arise out of the sale of goods depending on the facts surrounding the sale. *See* 6 *Del.C.* § 2–102.

Southern States maintains that UCC warranties are inapplicable here since the contract between itself and Durham was primarily a service contract for the application of herbicides. When a contract appears to be a mixed contract involving both goods and services, Delaware law requires the court to ascertain whether the contract is predominately one for the sale of goods or if it is mostly a services contract. *Neilson Business Equip. Center, Inc. v. Monteleone,* 524 A.2d 1172, 1174 (Del.1987). In this case, the predominant purpose of the entire transaction was to purchase herbicides for Durham's no-till farming operations and, ancillary to this sale, Durham needed a trained herbicide applicator to spray the fields because he lacked the technical knowledge to competently do the job. Moreover, Southern States' applicator, McClements, apparently mixed the chemical recipes at the job site and, thus, manufactured the ultimate herbicides that were to be applied on a particular day. Furthermore, the charges for the herbicides themselves were roughly ten times greater than the spraying charge assessed for applying the chemicals. In sum, the contract was primarily a contract for the sale of goods, that is, the herbicides; the spraying services related to the sale was only part of this sale. Accordingly, the warranty provisions of Article 2 are applicable in this case.

### 1. *Express Warranty*

An express warranty may be created by a seller through: (1) any affirmation of fact or promise to the buyer relating to the goods which becomes the basis of the bargain so that the goods conform to the affirmation or promise; (2) any description of the goods

which is made part of the basis of the bargain so that the whole of the goods conform to the sample of model. 6 *Del.C.* § 2–313(1)(a)–(c). The question of whether an express warranty has been made in a particular transaction is for the trier of fact. *See Pack & Process, Inc. v. Celotex Cor.*, Del. Supr., 503 A.2d 646, 659 (1985). In the case at bar, there are no written express warranties claimed, but instead, oral statements made principally by the Middletown store manager, Thomas, to Durham which the Trustee contends were express warranties.

The relevant testimony concerning Thomas' statements to Durham reveal several oral express warranties concerning the herbicides and their application which Southern States plainly breached. First, Thomas stated that water would be the carrier for the herbicides, especially since Durham wanted the job done inexpensively. In its application, Southern States used the nitrogen solution regardless of the University of Delaware recommendations dissuading its use and despite the fact that it is more expensive than using water as a carrier. Southern States' reference to the common trade usage of nitrogen in 1983 is inapposite in an action for breach of express warranty because it is the affirmation or promise—not the custom or trade usage—which becomes the standard against which a breach is determined. In addition, Thomas' statements were more than "seller's talk" or puffing in that they were product-specific and not overly broad or vague. Second, Thomas also made statements regarding the effectiveness of the herbicides in removing weeds and grass so as to promote successful no-till farming. The purchase of herbicides is characteristically the subject of express warranties because the buyer of the product cannot determine its effectiveness prior to use and evaluate its effectiveness in a given situation. Here, Thomas' statements in early May of 1983 were part of the basis of the bargain upon which Durham relied when purchasing the herbicides. Beyond this, Thomas had superior knowledge about the herbicides as opposed to Durham who had little or none. Consequently, Thomas' selection of herbicidal recipes combined with his statements as to their effectiveness amounted to any express warranty that the respective mixtures would do the job adequately. Thomas made at least two express warranties which formed the basis of Durham's purchase of the chemicals and were ultimately breached. The liability for breach of express warranty is a strict liability. No defect need be shown other than breach of the warranty itself which is the proximate cause of the property damage. *See, e.g., McCarty v. E.J. Korvette, Inc.*, 28 Md.App. 421, 347 A.2d 253 (1975); *Collins v. Uniroyal, Inc.*, 64 N.J. 260, 315 A.2d 16 (1974) (no "defect" other than a failure to conform to the warrantor's representations need be shown to establish a breach of express warranty). Accordingly, the court finds that Southern States breached its express warranty to Durham and, thus, is liable for the Durham's crop damage. The issues of proximate cause and damages will be addressed in separate sections below.

### 2. Implied Warranties

There are two theories of recovery for breach of implied warranty under the Delaware UCC: breach of implied warranty of merchantability under 6 *Del.C.* § 2–314 and breach of implied warranty of fitness for a particular purpose under 6 *Del.C.* § 2–315. The implied warranty of fitness for a particular purpose may, to some degree, overlap a seller's express warranty. *See Filler v. Rayex Corp.*, 435 F.2d 336, 338 (7th Cir.1970). *See generally* Annot., *Uniform Commercial Code: Implied Warranty of Fitness for Particular Purpose for Ordinary Use*, 83 A.L.R.3d 656 (1978). Unless there is a valid disclaimer, these implied warranties are implied in every sales transaction involving goods and run not only to those in contractual privity with the seller but to third party beneficiaries as well. *See* 6 *Del.C.* § 2–318; *Franchetti v. Intercale Automation, Inc.*, 523 F.Supp. 454 (D.Del.1981). Obviously, Durham was in direct privity with Southern States regarding the herbicides sale.

Turning first to the implied warranty of merchantability, there are five elements which the claimant must establish: (1) that a merchant sold goods, (2) which were not merchantable at the time of sale, (3)

proximately causing by the defective nature of the goods, (4) injury and damages to the claimant or his property, and (5) notice to the seller of the injury. *F.E. Myers Co. v. Pipe Maintenance Serv., Inc.,* 599 F.Supp. 697, 703 (D.Del.1984). As to the element requiring the seller to be a merchant, there is no doubt that Southern States was a merchant as defined under the Delaware UCC because it "deals in goods of the kind or otherwise by his occupation holds himself out as having the knowledge or skill peculiar to the practices or goods involved in the transaction ..." 6 *Del.C.* § 2–104(1). *See, e.g., Cropper v. Rego Distribution Center, Inc.,* 542 F.Supp. 1142, 1153–54 (D.Del.1982). *See also Neilson Business Equipment Center, Inc., supra,* at 1175. Southern States, as a farmers' co-op, regularly engaged in the sale of agricultural products and thereby is charged with the specialized knowledge or skill peculiar to those goods. It was plainly a merchant with respect to the type of goods sold to Durham.

■ Addressing the second element concerning whether the herbicides were "merchantable", the goods must pass without objection in the trade under the contract description *and* be fit for the ordinary purposes for which it was intended. 6 *Del.C.* § 2–314(2)(a) and (c). The facts show that Southern States sprayed (and in some instances resprayed) the various Durham farm tracts with herbicidal and other chemicals in order to increase the crop yields. Nevertheless, the farms' respective crop yields did not improve, but rather fell dramatically as the result of the chemical applications. Specifically, the herbicidal recipes were unfit for the ordinary purpose for which they were intended to be used, chemical agents that would kill weeds without damaging the primary crops. *Cf. American Fertilizer Specialists, Inc. v. Wood,* Okla.Supr., 635 P.2d 592 (1981). The chemicals did not operate for their ordinary purpose which was to promote no-till farming which is why Durham purchased them in the first place.

There is ample evidence to support the finding that the herbicides were not merchantable. Dr. Mitchell's unrebutted expert testimony indicates that Southern States incorrectly used liquid nitrogen as the herbicidal carrier rather than a water-based carrier. As a result, this created acidic soil conditions which inhibited operation of the herbicides. Also, Dr. Mitchell testified that:

... in evaluating herbicides and weed control systems at the University in research programs we used to set our confidence limit at about 85 percent. And if a chemical as a weed control system provided 85 percent better weed control as compared to the untreated check or control, then it was usually thought of as an acceptable program.

Trustee's Appendix at 854. In this case, the herbicides did not effectively control 85% of the weeds; instead, the weeds flourished and the crops died. Dr. Mitchell cited a number of other reasons for the crop failure, including: Southern States' improper selection of herbicides needed to control weeds based on the time of the crop planting, its failure to use a sufficient volume of carrier, and its applicator's failure to perform the necessary inspections (such as the "hands and knees" examination) to determine what herbicide recipe should be applied. *See* Trustee's Appendix at 921–933. Overall, Dr. Mitchell concluded that "if I take the overview of this thing, ... I'm very clear in my mind that those yield reductions were related to events that we've been discussing here, herbicides, nitrogen solution, rates ... wrong chemicals." Trustee's Appendix at 1367. Based on this evidence, the court concludes that the herbicide and other chemicals were not merchantable since they neither could pass in the trade without objection nor were they fit for the ordinary purpose for which they were intended.

As for proximate cause and damages, the court finds that these elements have been met. However, like the breach of express warranty discussed earlier, the causation should be analyzed in one place in view of the causation problems that naturally follow in an agricultural products liability case. Therefore, each of these matters are subsequently discussed in separate sections.

■ Finally, the notice requirement for a breach of implied warranty of merchantability cause of action was plainly met. Durham notified Southern States as soon as

he suspected that the herbicides were failing to work just a few weeks after their application. Section 2–607(3)(a) provides that the "buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or he is barred from any remedy." 6 *Del.C.* § 2–607(3)(a). The point of notice is to allow the seller to minimize damages by possibly correcting the defect as well as to protect the seller against stale or baseless warranty claims. In this instance, Southern States had been informed of the herbicides ineffectiveness and of crop damage whereby it resprayed many fields due to Durham's concerns. Again in late June, Durham notified Southern States that the herbicides were not working. Southern States was clearly aware of the potential products liability claim against it. Since notice and all other elements of a breach of implied warranty of merchantability under 6 *Del.C.* have been established, the court finds Southern States liable under this UCC provision.

 Southern States also breached the implied warranty that the herbicides were fit for their particular purpose. As prescribed by 6 *Del.C.* § 2–315, this implied warranty is imposed:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

*Id. See also Neilson Business Equipment Center, Inc., supra,* at 1175–76. The implied warranty of fitness for a particular purpose is narrower than the implied warranty of merchantability, but like the implied warranty of merchantability, the implied warranty of fitness is a "gap-filler" provision of the UCC which is implied in every sale of goods unless explicitly disclaimed.

The breach of this warranty is the one most apparent on the facts. As indicated earlier, Durham relied on Thomas' skill and judgment in selecting suitable herbicides to conduct no-till farming on his farms. The

chemicals were mixed by Southern States' herbicide applicator, McClements, before each job based on a formula or recipe provided by Thomas or some other Southern States official. The herbicides did not effectively do their job of keeping the fields clear of weeds and the crops died. Though thoroughly familiar with till farming, Durham had no experience with the no-till farming method and, therefore, was not a "sophisticated purchaser" who might have been able to recognize mistakes made by Southern States' personnel. As a result, the herbicides' failure to do their intended task coupled with Durham's reliance on Southern States' judgment and skill in formulating, mixing, and applying the herbicidal chemicals breached the implied warranty of fitness. *See Tyson v. Ciba–Geigy Corp.,* N.C.App., 82 N.C.App. 626, 347 S.E.2d 473 (1986); *Slemmons v. Ciba–Geigy Corp.,* Ohio App., 11 O.O.3d 37, 57 Ohio App.2d 43, 385 N.E.2d 298 (1978). Accordingly, Southern States is found to be liable under 6 *Del.C.* § 2–315.

### 3. *Proximate Cause*

 Southern States' primary defense against these various breach of warranties is that no proximate cause has been shown between the herbicides and the Durham farms' crop damage. Specifically, it contends that Dr. Mitchell never testified to a causal connection between the herbicidal application and the diminished crop yield. *See* Trustee's Appendix at 1359–61. Moreover, Southern States points out that 1983 was a bad year for farming due to the fact that weather conditions were extremely dry, especially that summer. The Trustee responds to this by stating that Southern States mischaracterizes Dr. Mitchell's testimony concerning causation and argues that the herbicides were the proximate cause of the crop damage.

 The court agrees with the Trustee that Southern States misstates Dr. Mitchell's testimony because that particular excerpt went only to application of the herbicides rather than the totality of circumstances surrounding the use of the product. Though the court did not find fault in Southern States' application of the chemicals, this

does not absolve it of the warranty breaches and the causal issues relating thereto. While causation may encompass negligent acts and omissions, it also covers matters which do not fall under negligence. *Sweetman v. Strescon Indus., Inc.,* Del.Super., 389 A.2d 1319, 1321 (1978). Here, there is definite causal link between the use of the product and the Durham crop failure. Dr. Mitchell's testimony that Southern States' formulation, combination, and application of the herbicides led to the low crop yield enables the court to find that the herbicides were a cause in fact of the damages.

 As to proximate cause, the general rule in Delaware is that this is reserved for the trier of fact. *McKeon v. Goldstein,* Del.Supr., 53 Del. 24, 164 A.2d 260, 262 (1960). Beyond the "but for" test required to find causation in fact, proximate cause involves an inquiry into the extent of a defendant's duty as well as the absence of any significant intervening cause which might break a causal chain. Under a products liability rubric employing implied warranty of merchantability, a plaintiff must show a sufficiently close causal connection between the goods and injury. *See* J. White & R. Summers, *Uniform Commercial Code* § 9–9, at 417 (3d ed. 1988). In establishing proximate cause, it is not always necessary to proffer expert testimony when the relationship between product and injury is reasonably obvious so as to infer cause and effect. *Id.* at 418. In this case, there was both expert and circumstantial evidence which would substantiate the fact that the herbicides precipitated the crop damage. As to whether there was any "significant intervening cause" which might relieve Southern States from responsibility, *see Naidu v. Laird,* Del.Supr., 539 A.2d 1064, 1075 (1988), dry weather, and other factors may have had some effect on the dismal harvest. Nevertheless, it was the herbicides which were the primary cause of the crop damage and other factors such as the 1983 drought only compounded the problem. In sum, the court finds that the herbicides were the proximate cause of the damages under all three warranties breached in this case.

4. *Damages*

 Section 2–715 of the Delaware U.C.C. provides for incidental and consequential damages as a remedy for breach of warranty when the damages were reasonably foreseeable at the time of contracting. 6 *Del.C.* § 2–715. *See Falcon Tankers, Inc. v. Littleton Systems, Inc.,* Del.Super., 355 A.2d 898, 907 (1976). Essentially, this approach follows the common law rule enunciated in *Hadley v. Baxendale,* 156 Eng.Rep. 145 (Ex. 1854) which has been adopted in Delaware for contract and tort actions. *See Hajoca Corp. v. Security Trust Co.,* Del.Super., 41 Del. 514, 25 A.2d 378, 381–82 (1942) (damages in contract cases); *Clemens v. Western Union Telegraph Co.,* Del.Super., 42 Del. 138, 28 A.2d 889, 891–92 (1942) (damages in tort cases). *See generally* J. White & R. Summers, *supra,* at § 10–4 (application of *Hadley V. Baxendale* rule under U.C.C.). Thus, the reduced crop yields and the resulting loss of income to Durham for the 1983 season is the proper measure of damages here.

 Throughout this Opinion, the diminished crop yield in 1983 has been referred to as "crop damages" without too much specificity as to the quantity and degree of the damage. Durham planted 738.6 acres of corn and 230 acres of soybeans that year yielding 32,911.07 bushels of corn and 2,028 bushels of beans, respectively. Utilizing 1981, 1982, and 1984 as baseline years, Durham anticipated a corn crop yield of 59,826.60 bushels—which is 26,915.53 bushels more than the harvest actually realized—and 6,095 bushels of beans which is 4,067 bushels more than the actual yield. Applying the then market rates of $3.075 per bushel of corn and $7.06 per bushel of soybeans, the expectant crop damages for 1983 would reflect a monetary amount of $82,765.25 for the corn crop (26,915.53 × $3.075) and $28,713.02 for the bean crop (4,067 × $7.06) for a total sum of $111,478.27. This methodology for estimating damages was employed by Dr. Mitchell, and these figures are based on the testimony of Dr. Mitchell and Dudley Durham. Overall, the 1983 crop harvest was 45% below the expectant crop yield.

Southern States raises a number of issues regarding the methodology employed by Dr. Mitchell in the estimation of the crop damages. First, Southern States argues that a field-by-field analysis would have revealed a lower aggregate damage figure of 37% rather than 45% below the expectant 1983 crop yield. Southern States further contends that the 1983 county average of the respective crop yields would be a more appropriate measure in estimating damages than Dr. Mitchell's methodology. Instead of going through an extensive run down of Southern States' reasoning, it is sufficient to note that application of different statistical methods will undoubtedly result in different mathematical figures. Still, Southern States did not present any expert testimony to contradict Dr. Mitchell's extensive analysis on damages; the court finds that Dr. Mitchell's and Durham's estimates on the probable crop yield for 1983 were credible and reasonable estimates under these circumstances. *Cf. Hill v. Basf Wyandotte Corp.*, 782 F.2d 1212 (4th Cir.1986) (herbicidal crop damage could be reasonably estimated by an experienced farmer). Finally, Southern States argues for setoff of $33,912.97 for spraying charges as well as $32,382.43 for various goods, including fertilizer. Nevertheless, under 6 *Del.C.* § 2–714, a buyer is permitted to include the consequential damages resulting from the breach of warranty. Here, the consequential damages include the costs of spraying, herbicides, fertilizer, etc. and, thus, no setoff should be permitted except for those items unrelated to Southern States' herbicide application such as, *inter alia*, seed, baler, twine, tires, fuel, oil, antifreeze, and batteries. Hence, $9,934.02 for those items should be offset against the $111,478.27 for a total of $101,544.25 in favor of the Trustee.

*Intentional Interference with Contractual Relations Claim Against Southern States for Alleged Harm Resulting from Assertion of its Crop Lien*

The Trustee contends that Southern States intentionally and improperly interfered with the performance of the contract between Elevator and the Durhams by not releasing its crop lien which effectively froze all the Durhams' available funds; conse-quently, the Durhams were forced to file their bankruptcy petitions to avoid the lien. The Trustee further contends that the Durhams are entitled to compensation for the injuries they suffered because of Southern States' interference. Since the law that applies is the law of the state where the alleged tort occurred, the law of Delaware governs this issue. *Friday v. Smoot*, Del.Supr., 58 Del. 488, 211 A.2d 594 (1965).

The tort of intentional interference with performance of a contract by a third person is recognized in Delaware. The Delaware courts have adopted the view of the Restatement of Torts (Second) § 766 (1977). *Irwin and Leighton v. W.M. Anderson Co.*, Del.Ch., 532 A.2d 983, 992 (1987). The necessary elements of this tort are: (1) a contract between plaintiff and third party; (2) knowledge by the defendant of the existence of the contract; (3) an intentional act by defendant that is a significant factor in causing the breach of such contract; (4) that defendant acted without justification; (5) damage to the plaintiff as a result of such interference. *Irwin*, 532 A.2d at 992 (citing Restatement of Torts (Second), § 766).

The existence of a contract between Elevator and the Durhams is not disputed. Southern States' knowledge of the contract is also not disputed. In addition, it is clear that Southern States intentionally intervened in the relationship between Elevator and the Durhams in order to assure itself payment of the amount it believed it was owed. This intervention caused Elevator to breach its contract with the Durhams by not allowing them to pay the money they owed on the contract. The critical issue is whether such interference by Southern States was justified under the particular circumstances. Section 767 of the Restatement sets out a number of factors that are to be considered in making such a determination. The Restatement also contains additional provisions (§§ 769–773), which deal with narrower situations in which application of the § 767 factors have produced more clearly articulated standards. Restatement (Second) of Torts § 767 Comment a (1977). The Comments go further to state, "The specific applications in these sec-

tions therefore supplant the generalization expressed in this section". Restatement (Second) of Torts, *Supra,* Comment a. Applicable here is § 773 (asserting bona fide claim) which is recognized in Delaware. *Wilgus v. Salt Pond Inv. Co.,* Del.Ch. 498 A.2d 151, 160 (1985). Section 773 provides:

> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

This defense will protect the defendant only when: (1) he has a legally protected interest; (2) in good faith asserts or threatens to protect this interest; and (3) the defendant acts to protect its interest by appropriate means. Restatement (Second) of Torts § 773 Comment a (1977). If these circumstances exist, the defendant has a meritorious defense to the alleged tort of intentional interference with performance of a contract by a third person.

### 1. *Southern States has a Legally Protected Interest*

■ The Durhams gave a security interest in their crops to Southern States in return for Southern States advancing them credit. There has never been any suggestion by the Trustee that the security agreement dated September 12, 1983 or the financing statement filed on September 23, 1983 were not valid and in conformity in all material respects with Title 6 of the Delaware Code (Delaware's version of the U.C.C.). There is no doubt pursuant to Delaware law that Southern States' security interest is a legally protected interest.

### 2. *Southern States Asserted Its Legally Protected Interest in Good Faith*

■ The Trustee contends that Southern States acted maliciously and with the bad intent and purpose of putting the Durhams out of business. To support its contention, the Trustee refers to a few comments made by different representatives of Southern States on the phone and at various meetings in the Fall of 1983. While negotiations between Southern States and the Durhams might have been unpleasant at times, there is no evidence to suggest that Southern States' interest at these meetings was anything other than assuring itself of payment from the Durhams. Bad faith on the part of Southern States cannot be inferred from mere speculation on what their intent might have been. Southern States' failure to release funds upon which it had a lien for payment of the Durhams' account was a legally protected right. Without any evidence showing otherwise, no dishonorable motive may be inferred from Southern States' enforcement of this right.

### 3. *Southern States Used Appropriate Means in Asserting Its Legally Protected Interest*

■ The Trustee has never contended that the assertion of the crop lien was an inappropriate means for Southern States to secure payment. Rather, he only disputes the amount of money that the Durhams owe to Southern States. However, this does not make Southern States' assertion of its lien and refusal to release any of the funds subject to the lien inappropriate. While the Delaware Commercial Code permits the creation of security interests and provides mechanisms to enforce the security interests (crop liens), it also provides a framework to protect the interests of all parties. *See generally* Del.Code Ann. Title 6 § 9 (Article 9). The Durhams were not without a means to protect themselves. The Code has a specific procedure wherein the debtor can send a document to the secured party requesting exactly that amount of the funds in which it claims a security interest. *Maryland Nat. Bk. v. Porter–Way Harvester Mfg. Co.,* Del. Supr., 300 A.2d 8, 10–11 (1972), Del.Code Ann. Tit. 6 § 9–208 (1974). The secured party must then comply with such request within two weeks. 300 A.2d 8; § 9–208. If the Durhams had availed themselves of § 9–208, the amount of funds covered by Southern States' lien might have been ascertained.

In addition, the failure of Southern States to comply with § 9–208 would have made them liable for any loss caused to the Durhams by such failure. Del.Code Ann. Tit. 6 § 9–208 (1974).

Because Southern States' actions meet the three part test set forth in § 773 of the Restatement of Torts (Second), the tort claim of intentional interference with contractual relations against Southern States must be denied.

An Order in accordance with this Memorandum Opinion is attached.

## ORDER

AND NOW, February 3, 1994, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED:

1. Judgment is entered in favor of James L. Patton, Jr., Trustee of the consolidated estate of Debtors, Dudley B. Durham, Jr., Barbara L. Durham, L.B. Trucking, Inc. and Double D Farms, Inc. against Southern States Cooperative, Incorporated, t/a Southern States Middletown Service Cooperative on the Trustee's counterclaim as follows:

| | | |
|---|---|---|
| Damages | $111,478.27 | |
| Less Credit for Items Unrelated to Herbicide Damages | 9,934.02 | |
| Judgment | $101,544.25 | with interest from February 3, 1994 and costs. |

2. Southern States Cooperative, Incorporated's claim for monies owed in connection with its sale and application of herbicides and other chemicals on the Durhams' farm fields is DISMISSED.